**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

DEC 1 2 2005

at __10__ o'clock and __10__ min. __A__M
SUE BEITIA, CLERK

| | | |
|---|---|---|
| MATTHEW KUOLT, | ) | CIVIL NO. 04-00489 HG-KSC |
| Plaintiff, | ) | |
| | ) | FINDINGS AND RECOMMENDATION TO GRANT DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |
| vs. | ) | |
| | ) | |
| STATE OF HAWAII, et al., | ) | |
| Defendants. | ) | |

**FINDINGS AND RECOMMENDATION TO GRANT DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Before the court are two Motions for Summary Judgment ("Motions"). The Motions were referred to this court pursuant to 28 U.S.C. § 636(b) and Local Rule ("LR") 72.4. Defendant Dr. Kay Bauman M.D., Medical Director of the State of Hawaii Department of Public Safety ("DPS") filed the first motion. Defendants DPS, Oahu Community Correctional Center ("OCCC") Medical Unit, and Doctor Edward Zienkiewicz M.D., filed the second Motion. Dr. Bauman has joined the second Motion.

A hearing was held on December 12, 2005. Deputy Attorney General Kendall J. Moser appeared on behalf of DPS, OCCC Medical Unit, and Dr. Zienkiewicz. April Luria, Esq., appeared on behalf of Dr. Bauman. Plaintiff Matthew Kuolt, an inmate proceeding *pro se*, appeared at the hearing by telephone. The

68

court recommends granting Defendants' Motions for the reasons set forth below.

## BACKGROUND

The only claims remaining in this 42 U.S.C. § 1983 prisoner civil rights action are for Defendants' alleged failure to provide Kuolt with timely or adequate medical care following an assault by another inmate while he was incarcerated at Oahu Community Correctional Center ("OCCC"). Kuolt alleges that Bauman, Zienkiewicz, the OCCC Medical Unit, and DPS violated the Eighth and Fourteenth Amendments through their alleged deliberate indifference to his serious medical needs. Kuolt seeks general, special, compensatory, and punitive damages.

## LEGAL STANDARD

Summary judgment shall be granted when

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see also Porter v. Cal. Dep't of Corr., 383 F.3d 1018, 1024 (9th Cir. 2004); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. See id. at 323. A moving party without the ultimate burden of persuasion at trial--usually, but not always, the defendant--has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). The moving party must identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted). The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial." Porter, 383 F.3d at 1024 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003); Addisu, 198 F.3d at 1134 (stating "[t]here must

be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion").

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." T.W. Elec. Serv., 809 F.2d at 631. In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. Porter, 338 F.3d at 1024. The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage. Id. However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. T.W. Elec. Serv., 809 F.2d at 631.

Defendants style their Motions as summary judgment motions, however, the portion of their Motions based on Eleventh Amendment immunity is more accurately viewed as a motion to dismiss for lack of subject matter jurisdiction, under Rule 12(b)(1) of the Federal Rules of Civil Procedure. See Fla. Dept. of State v. Treasure Salvors, 458 U.S. 670, 683 n.18 (1982) (stating, the "fact that the State appeared and offered defenses on the merits does not foreclose consideration of the Eleventh Amendment issue; 'the Eleventh Amendment defense sufficiently

4

partakes of the nature of a jurisdictional bar' that it may be raised at any point of the proceedings.") (quoting <u>Edelman v. Jordan</u>, 415 U.S. 651, 678 (1974)); <u>see also</u> <u>Cal. Franchise Tax Bd. v. Jackson (In re Jackson)</u>, 184 F.3d 1046, 1048 (9th Cir. 1999) (stating that "Eleventh Amendment sovereign immunity limits the jurisdiction of the federal courts and can be raised by a party at any time during judicial proceedings or by the court *sua sponte*."); <u>Blue v. Widnall</u>, 162 F.3d 541, 544 (9th Cir. 1998); <u>Charley's Taxi Radio Dispach v. Sida of Haw.</u>, 810 F.2d 869, 873 n.2 (9th Cir. 1987); <u>but see</u> <u>Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.</u>, 527 U.S. 666, 675 (1991) (noting that sovereign immunity may be waived); <u>Hill v. Blind Indus. & Servs. of Md.</u>, 179 F.3d 754, 760, <u>as amended</u>, 201 F.3d 1186 (9th Cir. 1999) (same); <u>ITSI TV Prods., Inc. v. Agric. Assocs.</u>, 3 F.3d 1289, 1291-92 (9th Cir. 1993) (same, treating Eleventh Amendment immunity as an affirmative defense).

The Ninth Circuit has attempted to reconcile these apparently conflicting cases, calling states' Eleventh Amendment immunity "quasi-jurisdictional." <u>Bliemeister v. Bliemeister (In re Bliemeister)</u>, 296 F.3d 858, 861 (9th Cir. 2002). Under <u>Bliemeister</u>, sovereign immunity "may be forfeited where the state fails to assert it and therefore may be viewed as an affirmative defense." <u>Id.</u>

5

Under the Eleventh Amendment, a state is immune from certain actions brought in federal court by her own citizens or citizens of other states. Papasan v. Allain, 478 U.S. 265, 276 (1986); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100, 106 (1984); Mitchell v. Los Angeles Cmty. Coll. Dist., 861 F.2d 198, 201 (9th Cir. 1989). In the present Motions, Defendants assert Eleventh Amendment immunity. No matter how that immunity is characterized, Eleventh Amendment immunity bars Kuolt's claims against all Defendants in their official capacities for damages.

### DISCUSSION

Dr. Bauman argues that summary judgment should be granted in her favor because: (1) she is immune from damages claims in her official capacity under the Eleventh Amendment; (2) she had no personal involvement in any medical decisions relating to Kuolt's claims; (3) she is entitled to qualified immunity; (4) Kuolt's state law claim for medical negligence are unsupported by expert medical testimony; and (5) there is no basis to support Kuolt's claims for punitive damages against her.

Dr. Zienkiewicz, DPS, and the OCCC Medical Unit argue that summary judgment should be granted in their favor because: (1) they are immune from damages claims in their official capacity under the Eleventh Amendment; (2) they did not, as a matter of law, act with deliberate indifference to Kuolt's

serious medical needs; (3) they are entitled to qualified immunity; and (4) if other claims are dismissed, the court should decline to exercise supplemental jurisdiction over Kuolt's state law claims.

I.  All Defendants Have Immunity Under the Eleventh Amendment in Their Official Capacities.

"The Eleventh Amendment prohibits federal courts from hearing suits brought against an unconsenting state." Brooks v. Sulphur Springs Valley Elec. Coop., 951 F.2d 1050, 1053 (9th Cir. 1991) (citation omitted); see also Idaho v. Couer d'Alene Tribe, 521 U.S. 261, 267-68 (1997). The Eleventh Amendment also bars damage actions against state officials in their official capacities. See Doe v. Lawrence Livermore Nat'l Lab., 131 F.3d 836, 839 (9th Cir. 1997). The Eleventh Amendment bars suit against state agencies as well as suits naming the state itself. See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144 (1993); see also Lucas v. Dep't. of Corr., 66 F.3d 245, 248 (9th Cir. 1995)(per curiam) (stating that the Board of Corrections is an agency entitled to absolute immunity); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (concluding that the Nevada Department of Prisons is a state agency entitled to Eleventh Amendment immunity). The Eleventh Amendment, however, does not bar suits against state officials for prospective declaratory or injunctive relief. See Pennhurst

State Sch. & Hosp. v. Halderman, 465 U.S. 89, 102-06 (1997); Lawrence Livermore Nat'l Lab., 131 F.3d at 839.

Defendants, as State of Hawaii agencies or employees, are immune from suit for damages in their official capacities. This court recommends that Defendants' Motions for Summary Judgment on Kuolt's claims against them in their official capacities for monetary damages be GRANTED.

II. Dr. Bauman is Not Liable in Her Individual Capacity.

The uncontested facts before the court show that Dr. Bauman, as the DPS Medical Director, is responsible for certain administrative and managerial aspects of all of the medical units within the Department of Public Safety. At times she also provides treatment to inmates. On March 23, 2004, approximately a year and a half after Kuolt's jaw was injured, Dr. Bauman saw Kuolt for a routine checkup of his Hepatitis C and HIV conditions. (Bauman Affidavit ¶ 5.) This checkup was not related to Kuolt's jaw injury and was Dr. Bauman's only direct contact with Kuolt. (Id. ¶ 7.) Dr. Bauman states that she had nothing to do with any decisions relating to treatment of Kuolt's jaw injury, which is at issue here. (Id. ¶ 9.)

Kuolt does not dispute Dr. Bauman's assertions. Instead, he maintains that she is responsible for his injuries because she is the DPS Medical Director. Kuolt alleges that Dr. Bauman is responsible for alleged, and unspecified DPS policies

or procedures, or for the inadequate training of DPS medical personnel, which resulted in his alleged inadequate and untimely medical care. Other than his bare assertions, Kuolt presents no evidence supporting these allegations.

There is no respondeat superior liability under 42 U.S.C. § 1983. Polk v. County of Dodson, 454 U.S. 312, 325 (1981); Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1185 (9th Cir. 2002). To state a civil rights claim against an individual defendant, a plaintiff must allege facts showing a defendant's "personal involvement" in the alleged constitutional deprivation or a "causal connection" between a defendant's wrongful conduct and the alleged constitutional deprivation. Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998); Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989).

A supervisor may be held liable in his or her individual capacity "for his [or her] own culpable action or inaction in the training, supervision or control of [his or her] subordinates." Watkins v. City of Oakland, Cal., 145 F.3d 1087, 1093 (9th Cir. 1998) (quoting Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991)). "A supervisor is only liable for the constitutional violations of . . . subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (citation omitted). A

supervisor may also be held liable if he or she implemented "a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991)(en banc). However, an individual's "general responsibility for supervising the operations of a prison is insufficient to establish personal involvement." Ouzts v. Cummins, 825 F.2d 1276, 1277 (8th Cir. 1987).

There is no evidence before the court that Dr. Bauman participated in or directed the alleged constitutional violations that Kuolt claims. Kuolt, in fact, does not say that Dr. Bauman participated or directed the allegedly inadequate treatment he recieved at OCCC. He argues that she is responsible for his alleged constitutional violations due solely to her position as DPS Medical Director. Kuolt simply alleges that Bauman was responsible for DPS' "policy, practice, [or] custom that are attributable to inadequate timely medical care for inmates with serious injur[ie]s." (Op. 5.) Kuolt provides no evidence, however, that there was such a policy, practice, or custom, promulgated by Dr. Bauman, that was so deficient it resulted in a violation of Kuolt's constitutional rights. In short, Kuolt is alleging that, based on Dr. Bauman's position as DPS Medical Director, and her general responsibility for supervising the

10

various medical units throughout the DPS's prisons, she is liable for any alleged violations that may have occurred in the provision of care to him. This is insufficient to impose liability on Dr. Bauman as a matter of law. Moreover, as is more fully discussed below, this court finds that there has been no constitutional violation, and therefore, liability cannot be subscribed to Dr. Bauman in either her supervisory capacity, or in her individual capacity. This court finds and recommends that summary judgment be granted to Dr. Bauman in her individual capacity also, dismissing her from this action.

III. The Remaining Defendants Were Not Deliberately Indifferent to Kuolt's Medical Needs.

Kuolt alleges that he was not given timely or adequate care for his jaw injury due to DPS, OCCC Medical Unit, and Dr. Zienkiewicz's deliberate indifference to his serious medical needs in violation of the Eighth Amendement. This court does not agree.

"[D]eliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." Estelle v. Gamble, 429 U.S. 97, 105 (1976); see also Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc). This rule applies to "physical, dental, and mental health." Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982). Delay of, or interference with, medical treatment can amount to deliberate indifference. Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir.

11

2000) (en banc). Where the prisoner is alleging that delay of medical treatment evinces deliberate indifference, however, the prisoner must show that the delay led to further injury. McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992).

To establish an Eighth Amendment violation, a prisoner "must satisfy both the objective and subjective components of a two-part test." Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) (citation omitted); Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004). First, the prisoner must demonstrate that the prison official deprived him of the "minimal civilized measure of life's necessities." Hallett, 296 F.3d at 744 (citation omitted). Second, the prisoner must demonstrate that the prison official "acted with deliberate indifference in doing so." Id. (citation and internal quotation marks omitted).

A prison official acts with "deliberate indifference . . . only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1187 (9th Cir. 2002) (citation and internal quotation marks omitted). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference." Farmer, 511 U.S. at 837. "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter

12

how severe the risk." <u>Gibson</u>, 290 F.3d at 1188 (citation omitted). "This 'subjective approach' focuses only 'on what a defendant's mental attitude actually was.'" <u>Toguchi</u>, 391 F.3d at 1057 (quoting <u>Farmer</u>, 511 U.S. at 839). "Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059 (9th Cir. 1992) (alteration and citation omitted), <u>overruled on other grounds</u>, <u>WMX Techs., Inc. v. Miller</u>, 104 F.3d 1133, 1136 (9th Cir. 1997). Nor does "[m]edical malpractice . . . become a constitutional violation merely because the victim is a prisoner." <u>Estelle</u>, 429 U.S. at 105-06. Nor does a difference of opinion between the physician and the prisoner concerning the appropriate course of treatment amount to deliberate indifference to serious medical needs. <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332 (9th Cir. 1996); <u>Franklin v. Oregon</u>, 662 F.2d 1337, 1344 (9th Cir. 1981).

The undisputed facts show that Kuolt was assaulted by another inmate on August 10, 2002. In his Amended Complaint, Kuolt states that, after the attack, he "was seen by Medical personal [sic] and he or she took a picture of my bleeding mouth and ear." (Amd. Compl. Stmt. of Facts ¶ 5.) Kuolt says that he was then taken to the "hole" and left there. (<u>Id.</u> ¶ 6.) He states that he was in extreme pain and that he repeatedly pleaded with the guards to be seen by medical personnel but was ignored

13

until "on or about 8/26/02." (Id. ¶ 7.) Kuolt alleges that he was finally taken to the OCCC medical unit after sixteen days, where he was informed that he would be taken to the an outside clinic for an x-ray. Kuolt claims that during the intervening sixteen days he was given no "adequate pain medication so [he] suffered, terrible pain." (Id. ¶ 15.) In grievances he filed following this incident, Kuolt alleged that he was required to eat a liquid diet and was hungry, ascribing this to the inadequate and untimely care he received and was receiving. (Amd. Compl. Grievance No. 80724 Step 2.)

In direct contrast to Kuolt's allegations, Defendants provide documentation showing that on August 10, 2002, immediately following the assault, Kuolt was seen at OCCC Medical, was prescribed medication, and was referred to OCCC Dental on a priority basis. (Defs.' Ex. A at 2.) Kuolt was given Motrin 600 mg. and Pen VK (penicillin) 500 mg at this visit. (Id.)

The next day, August 11, 2002, Kuolt was seen by an OCCC nurse at his cell. (Id. at 4.) The nurse checked Kuolt's ear lacerations and noted that Kuolt said his "jaw felt better today" but he was having difficulty eating. (Id.) He was put on a chopped diet.

Kuolt was seen by Dr. Zienkiewicz at the OCCC Medical Unit two days after the assault, on August 12, 2005. (Id. 4.)

14

Dr. Zienkiewicz's notes of that visit show that Kuolt had already been "seen by Dental [and fractured] jaw ruled out." (Id.) Kuolt was scheduled for another appointment with Dr. Zienkiewicz one week later.

Kuolt was seen by OCCC medical personnel at his cell on August 11, 12, 13, 14, 15, 16, 17, 18, 19, and 20. (Id. 3.) Dr. Zienkiewicz examined Kuolt at the OCCC Medical Unit on August 12, and 19, 2002. On August 19, 2002, Dr. Zienkiewicz noted that Kuolt's jaw was "less painful but [there was] not as much improvement as I would expect," and he ordered Kuolt taken to St. Francis Medical Center for an x-ray. (Id. 5.) Kuolt was x-rayed at St. Francis Medical Center on August 22, 2002. (Id. 5, 7.) The next day, after receiving the x-ray results, which revealed that Kuolt's jaw was fractured, Dr. Zienkiewicz referred Kuolt to the Queen's Medical Center Dental clinic. (Id. 5, 8.)

Kuolt was seen by the Queen's Medical Center dentist or oral surgeon on August 26, 2002. (Id. 8.) The Queen's physician ordered the same treatment that Dr. Zienkiewicz had ordered: a chopped diet and Pen VK. Kuolt was then seen at Queen's on September 5, 19, and 25, October 10, and November 7, 2002. (Id. 8-13.) On November 7, 2002, Queen's dismissed Kuolt from treatment, stating that he had no "pathology or separation at fraction site[,]" was "healing at normal rate[,]" and that there was no need for a follow-up visit. (Id. 13.)

15

Finally, although Kuolt complained that he was forced to remain on a liquid diet and was, therefore, hungry, the record shows that Kuolt steadily gained weight while on the chopped diet prescribed by both OCCC Medical and the Queen's physician, from 182 lbs., with waist shackles, on August 13, 2002, to 192 lbs. on October 8, 2002, two days before he was put back on a regular diet by the Queen's physician. (Id. 14-16.)

Defendants' actions do not exhibit deliberate indifference to Kuolt's serious medical needs. Kuolt was seen and treated by OCCC medical personnel consistently throughout August. Dr. Zienkiewicz reasonably believed that Kuolt's jaw was not fractured, based on his medical experience and representations from OCCC Dental. When Dr. Zienkiewicz realized that Kuolt's jaw was not healing as quickly as he expected, he immediately ordered x-rays at St. Francis Medical Center. After receiving the x-ray results, Dr. Zienkiewicz immediately referred Kuolt to Queen's Medical Center, where Kuolt was seen on a weekly basis until he healed. It is instructive to note that Queen's personnel did not treat Kuolt's injury any differently than OCCC personnel did; Kuolt was kept on a chopped diet and prescribed penicillin and the same pain medicine he received from OCCC.

These facts do not support a finding that Dr. Zienkiewicz, or any DPS or OCCC employee, acted with deliberate indifference to Kuolt's serious medical needs. Even if Dr.

Zienkiewicz should have been aware of Kuolt's fractured jaw on August 12, 2002, which this court does not believe, at most Kuolt could make out a negligence claim. See Gibson, 290 F.3d at 1188. Nor has Kuolt demonstrated that the delay between the date of the assault and the date that he was x-rayed and a fracture was discovered, resulted in further injury to his jaw. McGuckin, 974 F.2d at 1060. Moreover, although Kuolt believes he should have been given a neurological examination, this is simply a difference of opinion between him and his treating physicians. This does not amount to a constitutional violation. See Jackson, 90 F.3d at 332. As a matter of law, this court finds that there was no Eighth Amendment violation and recommends that summary judgment should be granted to Dr. Zienkiewicz, DPS, and the OCCC Medical Unit.

IV. Defendants Are Entitled to Qualified Immunity.

Defendants also assert, in the alternative, that they are entitled to qualified immunity. This court agrees.

Saucier v. Katz, 533 U.S. 194 (2001), sets forth a two-step inquiry for determining whether qualified immunity applies. First, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged [must] show [that] the officer's conduct violated a constitutional right." Id. at 201. This prong of the Saucier inquiry "mirrors the substantive summary judgment decision on the merits." Sorrels v.

17

McKee, 290 F.3d 965, 969 (9th Cir. 2002). "If no constitutional right would have been violated were the allegations established," the inquiry ends. Saucier, 533 U.S. at 201. If there appears to have been a constitutional violation, however, the second step is to determine whether the right in question was "clearly established . . . in light of the specific context of the case, not as a broad general proposition." Id.; Walker v. Gomez, 370 F.3d 969, 974 (9th Cir. 2004).

As detailed above, the facts alleged do not show that the individual Defendants violated Kuolt's constitutional right to be free from cruel and unusual punishment through their deliberate indifference to his serious medical needs. See Saucier, 533 U.S. at 201. Thus, Kuolt's allegations do not make out a constitutional violation, and the individual Defendants have qualified immunity.

V.   The Court Recommends Declining Supplemental Jurisdiction.

Having recommended granting summary judgment as to all of the federal claims in this action, this court further recommends declining supplemental jurisdiction as to any of Kuolt's remaining state law causes of action. See Executive Software N. Am., Inc. v. United States Dist. Court, 15 F.3d 1484, 1492 (9th Cir. 1994; 28 U.S.C. § 1367(c)(3).

## CONCLUSION

For the foregoing reasons, it is hereby FOUND AND RECOMMENDED that Defendants' Motions for Summary Judgment be GRANTED, supplemental jurisdiction be DECLINED, and that the action be DISMISSED with prejudice.

Dated: Honolulu, Hawaii, December 12, 2005.

_____
KEVIN S.C. CHANG
UNITED STATES MAGISTRATE JUDGE

Kuolt v. Hawaii, et al., Civ. No. 04-00489 HG/KSC; FINDINGS AND RECOMMENDATION TO GRANT DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT; dmp/ F&R'S 05/Kuolt 04-489 MSJ